UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDRE DAVIS,

                Plaintiff,                   Civil Action No. 19-12121
                                                Honorable Laurie J. Michelson
v.                                        Magistrate Judge David R. Grand

REGENTS OF THE UNIVERSITY
OF MICHIGAN, SALLY J.
CHURCHILL, REBECCA PICKUS,
and MARIA VISCONTI,

                Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF Nos. 26, 27)

On January 4, 2021, defendants Regents of the University of Michigan, Sally Churchill, and Rebecca Pickus (collectively the "UM Defendants")[1] filed a Motion for Summary Judgment and brief in support.  (ECF Nos. 26, 27).  *Pro se* plaintiff Andre Davis ("Davis"), an incarcerated person, filed a response to this motion on February 3, 2021.  (ECF No. 30).  No reply was filed.  An Order of Reference was entered on November 1, 2019, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b).  (ECF No. 12).

Generally, the Court will not hold a hearing on a motion in a civil case in which a

---

[1] On December 30, 2019, this Court issued a Report and Recommendation ("R&R") to grant a motion for summary judgment filed by the other named defendant, Maria Principato (nee Visconti).  (ECF No. 17).  This R&R was adopted by the Honorable Laurie J. Michelson on May 14, 2020.  (ECF No. 23).  Thus, the UM Defendants are the only remaining defendants in this case.

party is in custody.  *See* E.D. Mich. LR 7.1(f).  Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the UM Defendants' Motion for Summary Judgment **(ECF Nos. 26, 27)** be **GRANTED**.

## II.    REPORT

### A.    Factual Background

Davis is a Michigan Department of Corrections ("MDOC") prisoner and is currently confined at the Chippewa Correctional Facility in Kincheloe, Michigan.  He brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his First and Fourteenth Amendment rights.  (ECF No. 1).  At the time of the events at issue in his complaint, Davis was housed at the Macomb Correctional Facility ("MRF") in Lenox Township, Michigan.

#### 1.    The Allegations in Davis' Complaint

In his complaint, Davis alleges that, in January 2018, he was one of fifteen prisoners selected to participate in the University of Michigan's "Inside-Out Prison Exchange Program"[2] at MRF.  (*Id.*, PageID.6).  He claims that, in February 2018, he was wrongfully terminated from that program after he submitted a writing assignment to his UM class

---

[2] UM's Inside-Out Prison Exchange Program, which is part of a larger nationwide program, brings together people in prison and academia to study crime, justice, and related social issues as peers. *See* https://www.insideoutcenter.org/about-problem-statement.html (last accessed April 26, 2021).

instructor, Defendant Rebecca Pickus.  (*Id.*, PageID.11-12).  Specifically, Davis asserts that he was informed by the MDOC's Corrections Program Coordinator, Maria Principato, that Pickus "had contacted the University and requested [Davis] be removed from the class because of [an] assignment paper he turned in" that Pickus determined to have violated the Program's rules.  (*Id.*, PageID.11).

Davis alleges that he was terminated from UM's Inside-Out Program without due process and in retaliation for the viewpoints he expressed.  (*Id.*, PageID.13-16).  He also alleges that he was treated less fairly than other similarly situated prisoners participating in the program.  (*Id.*, PageID.16).  In his complaint, Davis seeks compensatory damages, punitive damages, interest, and costs.  (*Id.*).

### 2.    *Pickus' Affidavit and Davis' Papers*

With their motion for summary judgment, the UM Defendants provided the salient documents, as well as an affidavit from Pickus.  (ECF No. 27-3).  To begin with, Pickus states that, at the first class she held with "inside" students, she talked at length about the rules and policies of the Inside Out Program, which were required to be followed, and each inside student as given a copy of the rules to take with him to review.  (*Id.*, PageID.257; ECF No. 27-4).  Pickus further avers that she emphasized repeatedly and explicitly that failure to comply with the program rules would result in immediate dismissal from the program. (ECF No. 27-3, PageID.257).  She also informed the inside students that removal from the program could be followed by further disciplinary action at the MDOC's discretion, such as transfer to a new facility.  (*Id.*).  Pickus also indicates in her affidavit that she emphasized that, due to the unique nature of the program and the associated safety

and security concerns, there would be zero tolerance for rules violations.  (*Id.*).

In her affidavit, Pickus further states that, within the first two months of her class, the Inside Out students had two "Reflection and Analysis" ("R&A") papers due.  (*Id.*, PageID.258; ECF No. 27-5).  According to Pickus, when she received Davis' first R&A paper, around January 30, 2018, she became immediately concerned because his paper "demonstrated an inappropriate and uncomfortable fixation on [her] personally, with a disproportionate intensity and dramatization of [her] identity and role in the class. Additionally, Mr. Davis was the only student in the class who failed to engage with the three required analysis questions in this assignment, and he reiterated multiple times his ambivalence about taking this course."  (ECF No. 27-3, PageID.258; *see also* ECF No. 27-8).  For example, in his first paper, which Pickus found overly-familiar and disconcerting, Davis wrote:

> And for whatever reason, knowing some of your life-experiences soothes my anxiety.  Afterall, if you're not afraid of everything that's ever brought you pain – the least I can do is be just as open as you are, and just as willing to struggle with myself as you are.  . . . I want to look forward to this class, but this is an unstable environment.  Things change quickly, and often without notice.  I never get too comfortable. . . . Thank you for opening a small piece of curtain in your window and letting us peer in.  You've been through some things.  Had, perhaps, more than your share of pain.  You're stronger for it.  You're powerful. Thank you for making the daily choice to use your powers for the good. I'm humbled.  More than you know (or maybe even care)."

(ECF No. 27-6, PageID.267).

Pickus further avers that, after consulting with a more experienced Inside Out instructor, she responded by exclusively addressing course content and themes, emphasizing the aspects of the paper that were appropriate and relevant (while ignoring

improper content), and asking Davis to answer the analysis questions in future papers. (ECF No. 27-3, PageID.258).  According to Pickus, Davis' second R&A paper, which was received on approximately February 13, 2018, recognized that it did not answer the assigned questions, "contained a dramatic increase in inappropriate content," and "again exhibited an over-familiarity and inappropriate closeness and fixation with [her]."  (*Id.*; *see also* ECF No. 27-8).  For example, Davis wrote:

> Your assessment of R&R Paper #1 was intended to be followed to a "t".  But without my approval, life got in the way. . . . I'm all about extending limits and expanding boundaries.  Which is why parts of your story is so encouraging. . . . You already sacrifice so much for us.  That this R&A paper will fail to meet your requirements is disappointing.  I'm just trying to push through, and I'll do better on R&A Paper #3. . . . With your Jewish heritage, that's a very interesting question.  In most, non-African American cultures, names are important.  A name can introduce who you are, before you utter a word. You demonstrated this by introducing yourself to the class as Rebecca, derived from the Hebrew 'Rivkah.'  Though you go by the abbreviated Americanized version 'Becca.'  It's unclear whether you mentioned Rebecca being the Mother of Israel.  (Literally, and figuratively).

(ECF No. 27-7, PageID.270, 272).

Davis also demonstrated his ambivalence about taking the Inside Out class, saying, "The truth of the matter is – my 1st, 2nd, and 3rd thought was to drop the class."  (ECF No. 27-7, PageID.270).  After consulting with faculty colleagues to confirm that her impulse to alert prison officials about Davis' writings and request his removal from the Inside Out class was the proper course of action, she emailed Maria Principato at the MDOC and requested Davis' removal from the program.[3]  (*Id.*).  Pickus further avers that

---

[3] Even after he was removed from the Inside Out class, Davis sent his third R&A paper to Pickus through another student.  (ECF No. 27-3, PageID.258).  Pickus felt that this paper "continued

none of the actions she took with respect to Davis, nor her evaluation of his work, was motivated by discrimination or retaliation for his viewpoints; rather, she requested his removal from the program "due to his repeated failure to engage course material and recognize proper student/instructor boundaries, which [she] considered to be [Inside Out] program rule violations." (*Id.*).

The UM Defendants now move for summary judgment on Davis' First Amendment retaliation and due process claims,[4] arguing that they are barred by both Eleventh Amendment immunity and qualified immunity. (ECF No. 27, PageID.238-47).[5]

### B.      Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also*

---

[Davis'] pattern of inappropriate language and content, and lack of recognition of proper boundaries." (*Id.*). For example, Davis wrote, "I'm in awe of what you do, and how you do it. If I can become ½ of what you are I'd be satisfied. Because wanting to be like you, or around you, means optimizing my gifts by keeping them in my consciousness at all times. . . . People who love like you expose people who do not love much, or at all." (ECF No. 27-10).

[4] Davis' complaint also contains a claim for violation of the Equal Protection Clause of the Fourteenth Amendment. (ECF No. 1, PageID.16). With respect to this claim, Davis alleges only: "Defendants have intentionally singled out and treated Plaintiff less favorably than other similarly situated persons, without any rational basis for that treatment." (*Id.*). Such a conclusory allegation is insufficient to plead a violation of the Equal Protection Clause, however. *See Glover v. Rivas*, No. 19-13406, 2021 WL 963936, at *4 (E.D. Mich. Mar. 15, 2021) (alleging specific instances where plaintiffs were treated differently by defendants without any "rational basis," without more, does not amount to an Equal Protection Clause violation). Thus, this claim should be dismissed.

[5] The UM Defendants also argue that summary judgment is appropriate because Davis failed to exhaust his administrative remedies against them, as required by the Prison Litigation Reform Act. (ECF No. 27, PageID.236-38). Because the Court is recommending granting summary judgment on other grounds, it need not address in detail the merits of this exhaustion argument.

*Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

C.   **Analysis**

1.   *Davis' Claims Against the UM Defendants in Their Official Capacities are Barred by Eleventh Amendment Immunity*

7

In their motion for summary judgment, the UM Defendants argue that Davis' claims against the University of Michigan, and against Pickus and Churchill in their official capacities, are barred by Eleventh Amendment immunity.  (ECF No. 27, PageID.238-39).  The Eleventh Amendment prohibits suit in federal court against the state or any of its agencies or departments unless the state has waived its sovereign immunity.  *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).  The State of Michigan has neither constitutionally nor statutorily waived its Eleventh Amendment immunity as to federal court litigation brought against it.  *See Morris v. Michigan Dep't of Corr.*, No. 21-10627, 2021 WL 1238129, at *2 (E.D. Mich. Apr. 2, 2021) ("The State of Michigan has not consented to being sued in civil rights actions in the federal courts[.]") (citing cases).

The Eleventh Amendment bar extends to actions where the state is not a named party, but where the action is essentially one for the recovery of money from the state.  *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  For this reason, suit in federal court against a state university – like the University of Michigan – and its board is treated as a suit against the state.  *See Hutsell v. Sayre*, 5 F.3d 996, 1002 (6th Cir. 1993); *see also Lipian v. Univ. of Michigan*, 453 F. Supp. 3d 937, 954 (E.D. Mich. 2020) ("The University of Michigan is a department of the government of the State of Michigan and is thus protected by the Eleventh Amendment.").  Similarly, a suit against state officials in their official capacities is tantamount to pleading the action against the entity of which the state officials are agents.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no

different from a suit against the State itself.") (internal citations omitted).  Thus, actions against state officials in their official capacities are included in the Eleventh Amendment bar.  *See Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (citing *Cady v. Arenac Cty.*, 574 F.3d 334, 344 (6th Cir. 2009) ("[A]n official-capacity suit against a state official is deemed to be a suit against the state and is thus barred by the Eleventh Amendment, absent a waiver.")).  Accordingly, Davis' claims against the University of Michigan, and against Pickus and Churchill in their official capacities, are barred by Eleventh Amendment immunity.

It is true that an exception to this immunity from suit applies if state officials are sued in their official capacities for prospective relief in the form of an injunction.  *See Ex Parte Young*, 209 U.S. 123 (1908); *Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (Eleventh Amendment "does not bar a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law").  Here, however, Davis has not sought such relief in his complaint; rather, he sought (1) compensatory damages, (2) punitive damages, (3) interest and costs, and (4) "[w]hatever other equitable relief appears appropriate at the time of final judgment."  (ECF No. 1, PageID.16-17).  In response to the UM Defendants' motion for summary judgment, Davis seeks to characterize his request for relief as falling within the exception to Eleventh Amendment immunity, asserting that he "has not made any claims for monetary damages" against the UM Defendants in their official capacities and claiming that, instead, his reference to equitable relief "speaks to prospective injunctive relief" against these defendants in their official capacities that "returns [him] to his position" in the Inside Out Program.  (ECF No. 30, PageID.303-04).

This argument lacks merit.  First, Davis' vague reference to "other equitable relief [that] appears appropriate at the time of final judgment" is hardly a present request for specific prospective injunctive relief.  Second, the fact that Davis has already been removed from the Inside Out Program is fatal to his argument that an exception to Eleventh Amendment immunity applies; as the *Lipian* court recognized, he is seeking "in effect, retrospective injunctive relief – that the University undo something that ha[s] already been completed." *Lipian*, 453 F. Supp. 3d at 955.  "*Ex Parte Young* did not contemplate that such relief fell within an exception to the Eleventh Amendment."  *Id.* (citing *Green v. Mansour*, 474 U.S. 64, 68 (1985) and *McGee v. Feneis*, No. 07-CV-4868, 2009 WL 2928245, at *5 (D. Minn. Sept. 8, 2009) (holding that the expungement of a state prison violation is a retroactive form of injunctive relief, and does not fall under the *Ex Parte Young* exception)).

Again, all of Davis' claims against the University of Michigan, and against Pickus and Churchill in their official capacities, are barred by Eleventh Amendment immunity.

### 2. *Davis' Claims Against Pickus and Churchill in Their Individual Capacities are Barred by Qualified Immunity*

The UM Defendants also argue that summary judgment is appropriate on Davis' individual-capacity claims against Pickus and Churchill[6] because such claims are barred

---

[6] There is no dispute that Churchill's only involvement in this matter consisted of responding to the March 22, 2018 "grievance" that Davis submitted to the UM Board of Regents.  (ECF No. 27-11).  In her June 13, 2018, letter to Davis, responding to this "grievance," Churchill informed him that UM played no role in decisions of the MDOC, and that his removal from the Inside Out Program for violating program rules was deemed appropriate and supported by ample evidence. (ECF No. 27-12).  The law is clear that Davis fails to state a plausible claim against Churchill where her alleged liability is based only upon her response to his grievance, rather than any direct involvement in the alleged unconstitutional conduct.  *See Alder v. Correctional Med. Svcs.*, 73 F. App'x 839, 841 (6th Cir. 2003) (mere denial of a prisoner's grievance states no claim of constitutional dimension); *Lee v. Mich. Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004)

by qualified immunity. (ECF No. 27, PageID.239-47). Qualified immunity shields public officials from suit under § 1983 unless their conduct violated clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). To overcome qualified immunity, a plaintiff must demonstrate (1) that the official violated his constitutional rights, and (2) that the violation was "clearly established at the time."[7] *Id.* at 818. Under this two-pronged test, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this case, Davis claims that (1) Pickus removed him from the Inside Out Program in retaliation for his speech, in violation of the First Amendment; and (2) as a "student," he was denied due process under the Fourteenth Amendment. For the reasons set forth below, Davis has not established that Pickus violated his constitutional rights in either of these respects.

### a. Davis' First Amendment Retaliation Claim Fails

In the prisoner context, to establish a First Amendment retaliation claim, a plaintiff must demonstrate that (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage

---

("Section 1983 liability may not be imposed simply because a defendant denied an administrative grievance or failed to act based upon information contained in a grievance."). Thus, summary judgment in favor of Churchill is appropriate.

[7] The "clearly established" prong exists "to ensure that officials are on notice that their alleged conduct was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015). In order to satisfy this requirement, a plaintiff must show that the right allegedly violated was clearly established in a "particularized sense." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

in that conduct; and (3) there is a causal connection between the first two elements – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

For purposes of a First Amendment retaliation claim, "[p]rotected conduct is defined as those actions taken pursuant to 'individual rights with which the government generally cannot interfere.'" *Manning v. Bolden*, 102 F. App'x 904, 905 (6th Cir. 2004) (quoting *Thaddeus-X*, 175 F.3d at 387). If a prisoner violates a legitimate prison regulation, however, he is not engaged in protected conduct and cannot proceed to the remaining stages of the analysis. *See Thaddeus-X*, 175 F.3d at 395.

In this case, Davis alleges in his complaint that he has the "right to speak freely in response to questions posed by a class instructor for a public university." (ECF No. 1, PageID.13). He then asserts, without pointing to any specific evidence, that Pickus retaliated against him "for exercising his 1st Amendment rights by singling him out based on [her] hostility toward his viewpoint opinion speech." (*Id.*). As set forth below, however, the evidence establishes that Davis was removed from the Inside Out Program not because of a disagreement over the substance of the opinions he voiced in his R&A papers, but because the nature and tenor of his writings violated the Program's rules. Because the speech in question violated the Program's rules, it does not constitute protected conduct.

In their motion for summary judgment, the UM Defendants cite two cases that directly support this conclusion. First, in *Corlett v. Oakland Univ. Bd. of Trustees*, 958 F. Supp. 2d 795, 797 (E.D. Mich. 2013), the plaintiff referred to his university English professor as "stacked" and graphically compared her to a sitcom character he fetishized in

12

a writing assignment.   There, the court held that such expressions, while possibly appropriate in some settings, need not be tolerated by university officials.[8]  *Id.*

The second decision cited by the UM Defendants, and on which the *Corlett* court relied heavily, is the Sixth Circuit's decision in *Settle v. Dickson Cty. Sch. Bd.*, 53 F.3d 152 (6th Cir. 1995).  There, a high school student brought a First Amendment challenge when her teacher refused to accept a research paper entitled "The Life of Jesus Christ" and gave her a zero for failing to write on another subject.   The Sixth Circuit found no First Amendment violation and upheld the district court's grant of summary judgment to school officials.  In doing so, the court explained:

> After reviewing the precedents concerning students' rights of free speech within a public school, we find few cases that address the conflict between the student's rights of speech in the classroom and a teacher's responsibility to encourage decorum and scholarship, including her authority to determine course content, the selection of books, the topic of papers, the grades of students and similar questions.   Students do not lose entirely their right to express themselves as individuals in the classroom, but **federal courts should exercise particular restraint in classroom conflicts between student and teacher over matters falling within the ordinary authority of the teacher over curriculum and course content**….
>
> **The free speech rights of students in the classroom must be limited because effective education depends not only on controlling boisterous conduct, but also on maintaining the focus of the class on the assignment in question.  So long as the teacher violates no positive law or school policy, the teacher has broad authority to base her grades for students on her view of the merits of the**

---

[8] Moreover, a prisoner's experience in a correctional educational program in the prison setting is obviously quite different than a student's typical experience at a public university.  As the UM Defendants aptly note, "[t]he expressive freedoms of the institutional student are necessarily restricted to a greater extent through the incorporation and agreement of program rules, like those agreed to by [Davis] in this case."  (ECF No. 27, PageID.242).

students' work....

Where learning is the focus, as in the classroom, student speech may be even more circumscribed than in the school newspaper or other open forum. So long as the teacher limits speech or grades speech in the classroom in the name of learning and not as a pretext for punishing the student for her race, gender, economic class, religion or political persuasion, the federal courts should not interfere.

Like judges, teachers should not punish or reward people on the basis of inadmissible factors – race, religion, gender, political ideology – but teachers, like judges, must daily decide which arguments are relevant, which computations are correct, which analogies are good or bad, and when it is time to stop writing or talking. Grades must be given by teachers in the classroom, just as cases are decided in the courtroom; and to this end teachers, like judges, must direct the content of speech. **Teachers may frequently make mistakes in grading and otherwise, just as we do sometimes in deciding cases, but it is the essence of the teacher's responsibility in the classroom to draw lines and make distinctions – in a word to encourage speech germane to the topic at hand and discourage speech unlikely to shed light on the subject. Teachers therefore must be given broad discretion to give grades and conduct class discussion based on the content of speech.** Learning is more vital in the classroom than free speech.

*Settles*, 53 F.3d at 155-56 (emphasis added).

Relatedly, given Pickus' role as an instructor *in the correctional setting*, it is appropriate to afford substantial deference to her evaluation of Davis' paper as containing "inappropriate content" and exhibiting "an over-familiarity and inappropriate closeness and fixation with [her]." (ECF No. 27-3, PageID.258). *See Bell v. Wolfish*, 441 U.S. 520, 562 (1979) (courts must give great deference to jail administrators as to prison operations to avoid becoming "enmeshed in the minutiae of prison operations"); *Turner v. Safley*, 482 U.S. 78, 84-85 (1987); *Kendrick v. Bland*, 740 F.2d 432, 438 & n.3 (6th Cir. 1984).

In the instant case, Pickus sent an email to MDOC Corrections Program Coordinator

Principato, asking that Davis be removed from the Inside Out Program due to what she viewed as his repeated failure to engage in course material and to recognize proper student/instructor boundaries, as discussed above. (ECF No. 27-8). In her email, Pickus described in detail how Davis' two R&A papers "contained a range of content that illustrates that he is not a good fit for this class[,]" including a "fixation and over-familiarity with [Pickus]"; a refusal to respond to questions about the reading posed in each assignment; statements that he was "ambivalent" about taking the class; and an "over-dramatization and an intensity in his papers that does not relate to the purpose of this academic course nor to our class discussions." (*Id.*, PageID.278). The content of Davis' papers discussed above, *see supra* at 4-6, establishes that Pickus' request was based upon legitimate program and safety concerns, rather than in retaliation for any of Davis' valid expressions related to relevant course content.[9] Thus, Davis' First Amendment retaliation

---

[9] In his response to the UM Defendants' motion for summary judgment, Davis disputes Pickus' assertions that his R&A papers violated program rules. (ECF No. 30, PageID.304-11). Specifically, he indicates that she did not "exclusively" address course content when providing him feedback on his papers, as she asserts, but instead raised several questions that were not posed to other students and were not part of the "official" course curriculum, to which he responded, making his answers "protected student speech." (*Id.*). The Court disagrees. Pickus made clear in her communication to Corrections Program Coordinator Principato the issues she had with Davis' R&A papers, and those issues included far more than the substance of his response to certain thought-provoking questions she posed. (ECF No. 27-8). Indeed, among other concerns, Pickus noted that Davis' papers reflected "[a] fixation and over-familiarity with me, in which he seems to be conducting a personal correspondence with me through his paper rather than engaging with the academic course material," "[a] refusal to respond to questions about the readings that I pose, including a direct message to me in his paper that he states that he purposely has chosen not to answer the questions," "[s]tating that he is ambivalent about taking the class," and "an over-dramatization and an intensity in his papers that does not relate to the purpose of this academic course nor to our class discussions." (*Id.*, PageID.278). Again, all of Pickus' concerns are borne out in the record. *See supra* at 4-6. Thus, Davis' reliance on the feedback Pickus provided in response to his R&A papers does not create a genuine issue of material fact as to whether he was engaged in protected conduct.

claim fails because he was not engaged in protected conduct.

b.    Davis' Due Process Claim Fails

Davis also alleges that he was terminated from UM's Inside-Out Program without due process.  (ECF No. 1, PageID.15-16).  The Fourteenth Amendment protects an individual from deprivation of life, liberty, or property without due process of law.  *See Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005).  To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake.  *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007).

"[F]ederal courts consistently have found that prisoners have no constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs under the Fourteenth Amendment." *Adams v. Mohrman*, No. 20-cv-99, 2020 WL 4581655, at *3 (W.D. Mich. Aug. 10, 2020) (citing cases).  *See also Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (prisoners have no constitutional right to rehabilitation, education, or jobs); *Carter v. Morgan*, No. 97-5580, 1998 WL 69810, at *2 (6th Cir. Feb. 10, 1998) (no constitutional right to educational classes); *Canterino v. Wilson*, 869 F.2d 948, 952-54 (6th Cir. 1989) (no constitutional right to rehabilitation); *Sanders v. Davenport*, No. 13-12287, 2013 WL 4833977, at *1 (E.D. Mich. Sept. 11, 2013) (no constitutionally-protected interest in participating in an educational program while in prison).

Here, the Inside Out Program is an international educational program based out of Temple University in Philadelphia.  (ECF No. 27-1).  Its purpose is to bring traditional

16

college students and incarcerated individuals together in semester-long courses to explore and learn about issues of crime and justice from inside prisons. (*Id.*). Davis does not dispute that the Inside Out Program is an educational prisoner program. Thus, he has no constitutionally protected liberty interest in participating in this program, and therefore no right to remain in it unless due process has been afforded.

As Davis had no constitutionally protected liberty interest in remaining in the Inside Out Program, Pickus did not violate Davis' clearly established constitutional rights when she asked MDOC Corrections Program Coordinator Principato to remove him from the program due to his repeated failure to engage in course material and recognize proper instructor/student boundaries (which she explained in significant detail in her written request). (ECF No. 27-8). Thus, Pickus is entitled to qualified immunity on Davis' due process claim.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that the UM Defendants' Motion for Summary Judgment **(ECF Nos. 26, 27)** be **GRANTED**.

Dated: April 27, 2021                          s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                                       United States Magistrate Judge

## <u>REVIEW</u>

The parties to this action may object to and seek review of this Order and Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure

to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

**Note these additional requirements at the direction of Judge Michelson:**

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Order and Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 27, 2021.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
